NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12413


1A AUTO, INC., & another[1]  vs.  DIRECTOR OF THE OFFICE OF
CAMPAIGN AND POLITICAL FINANCE.



Suffolk.     March 6, 2018. - September 6, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.



Elections, Political contributions.  Constitutional Law, Freedom
of speech and press, Freedom of association, Equal
protection of laws.




Civil action commenced in the Superior Court Department on
February 24, 2015.

The case was heard by Paul D. Wilson, J., on motions for
summary judgment.

The Supreme Judicial Court granted an application for
direct appellate review.


James Manley, of Arizona (Gregory D. Cote also present) for
the plaintiffs.
Julia Kobick, Assistant Attorney General (William W.
Porter, Assistant Attorney General, also present) for the
defendant.

---

[1] 126 Self Storage, Inc.

Ben T. Clements, M. Patrick Moore, Jr., Ryan P. McManus, John C. Bonifaz, Ronald A. Fein, & Shann M. Cleveland, for Common Cause & another, amici curiae, submitted a brief.

GANTS, C.J.  For more than a century, Massachusetts law, like Federal law, see 52 U.S.C. § 30118(a) (2012 & Supp. II), has prohibited business corporations from making contributions to political candidates or their campaigns.  See St. 1907, c. 581.  The plaintiffs here are business corporations who challenge Massachusetts's ban on corporate contributions, G. L. c. 55, § 8, claiming that it imposes an unconstitutional restraint on their rights to free speech and association.  The corporations also claim that, because § 8 prohibits corporations from making contributions but does not also prohibit other entities -- such as unions and nonprofit organizations -- from doing so, it denies them their right to equal protection under the law.  We affirm the Superior Court judge's grant of summary judgment in favor of the defendant, the director of the Office of Campaign and Political Finance (OCPF), on both claims.[2]

Background.  1.  Limits on corporate political spending. Laws limiting the political spending of corporations have a long historical pedigree.  The earliest such laws emerged more than a century ago, as growing public concern over the influence of

[2] We acknowledge the amicus brief submitted by Common Cause and Free Speech for People.

corporations in politics led to widespread calls for regulation. Federal Election Comm'n v. Beaumont, 539 U.S. 146, 152 (2003) (Beaumont). See R.E. Mutch, Buying the Vote: A History of Campaign Finance Reform 16-17, 33, 43-44 (2014). In 1905, President Theodore Roosevelt urged Congress to take action, recommending a total ban on corporate political contributions in order to prevent "bribery and corruption in Federal elections." 40 Cong. Rec. S96 (Dec. 5, 1905). Congress responded in 1907 by enacting the Tillman Act, 34 Stat. 864 (1907), which prohibited "any corporation" from "mak[ing] a money contribution in connection with any election to any political office."

The same year that Congress enacted the Tillman Act, the Massachusetts Legislature enacted its own law prohibiting corporations from making campaign contributions. See St. 1907, c. 581, § 3.[3] Over the next few decades, the Legislature further refined this ban on corporate contributions, while integrating it into its broader efforts to combat corruption in State elections. See, e.g., St. 1913, c. 835, §§ 353, 356 ("Corrupt Practices" section of "An Act to codify the laws relative to primaries, caucuses and elections"); St. 1946, c. 537, § 10 ("An

---

[3] The Massachusetts law initially prohibited only certain corporations from making campaign contributions, St. 1907, c. 581, § 3, but was soon amended to apply to all "business corporation[s] incorporated under the laws of[] or doing business in this commonwealth." St. 1908, c. 483, § 1.

Act relative to corrupt practices, election inquests and violations of election laws").  In 2009, the Legislature extended the ban to apply not only to traditional business corporations but also to any "professional corporation, partnership, [or] limited liability company partnership." St. 2009, c. 28, § 33.

Massachusetts's current ban on corporate contributions, G. L. c. 55, § 8, prohibits business corporations and other profit-making entities from making contributions with respect to State or local candidates.  It states, in relevant part:

> "[N]o business or professional corporation, partnership, [or] limited liability company partnership under the laws of or doing business in the commonwealth . . . shall directly or indirectly give, pay, expend or contribute[] any money or other valuable thing for the purpose of aiding, promoting or preventing the nomination or election of any person to public office, or aiding or promoting or antagonizing the interest of any political party."

To understand what a business corporation may and may not do to support a political candidate under current Massachusetts law, we need to describe the different possible ways in which money can be used to support a political candidate's campaign. One way is to make contributions, in cash or things of value, directly to the candidate or to a committee organized on the candidate's behalf.  See G. L. c. 55, § 1.  A second way is to establish and pay the administrative expenses of a political action committee (PAC), which may then raise money from various

sources, and use that money to support a candidate's campaign. See G. L. c. 55, §§ 1, 5. A third way is to make contributions to a PAC. See G. L. c. 55, § 1. A fourth way is to make "independent expenditures," which are expenditures made to advocate for or against a candidate -- for example by purchasing newspaper, radio, or television advertising praising the candidate or criticizing his or her opponent -- that are not made in cooperation with or in consultation with any candidate. See id. A fifth way is to make contributions to independent expenditure PACs, sometimes called "super PACs," which, unlike ordinary PACs, may only make independent expenditures and may not contribute to candidates. See G. L. c. 55, § 18A (d). See also OCPF, Interpretive Bulletin, OCPF-IB-10-03 (Oct. 2010) (rev. Jan. 2015); OCPF, Campaign Finance Activity by Political Action Committees in Massachusetts, 2011 & 2012, at 12 (July 2013).

Under Massachusetts law, corporations may not make any contributions to a candidate or to a candidate's committee, may not establish or administer a PAC, and may not contribute to a PAC that is not an independent expenditure PAC. See Op. Atty. Gen. No. 10 (Nov. 6, 1980), in Rep. A.G., Pub. Doc. No. 12 at 118-120 (1981). See also OCPF, Advisory Opinion, OCPF-AO-00-05 (Apr. 21, 2000); OCPF, Advisory Opinion, OCPF-AO-98-18 (July 31, 1998). Corporations may, however, make unlimited "independent

expenditures," subject to certain disclosure requirements. See G. L. c. 55, §§ 18A, 18C, 18G. They may also make unlimited contributions to independent expenditure PACs. See 970 Code Mass. Regs. § 2.17 (2018). See also OCPF, Interpretive Bulletin, OCPF-IB-10-03, supra.

To illustrate, if a Massachusetts corporation wants to support a certain John Hancock for Massachusetts governor, it may not contribute money directly to Hancock or to Hancock's campaign committee. Nor may it establish and administer a PAC to solicit contributions for Hancock, or contribute to a PAC that in turn makes campaign contributions to Hancock. The corporation may, however, spend as much money as it likes advocating on behalf of Hancock, as long as it does so independently from him and his campaign. For example, it may, on its own initiative and without coordinating with Hancock, pay for a television advertisement urging viewers to vote for Hancock. It may also contribute to an independent expenditure PAC, which, provided it does not coordinate with Hancock, may spend money promoting him to the public.

2. The present action. The plaintiffs in this case are two separate family-owned corporations doing business in Massachusetts. 1A Auto, Inc., is an automobile parts retailer in Pepperell. 126 Self Storage, Inc., operates a self-storage facility in Ashland. Under § 8, the plaintiffs are barred from

making political contributions that they would otherwise choose to make.

The plaintiffs filed suit against the director of OCPF in his official capacity, seeking declaratory and injunctive relief against the continued enforcement of § 8.  The plaintiffs alleged that, in banning corporate contributions, § 8 violates their free speech and association rights guaranteed under the First Amendment to the United States Constitution and arts. 16 and 19 of the Massachusetts Declaration of Rights.  The plaintiffs also alleged that § 8 violates their right to equal protection of the law under the Fourteenth Amendment to the United States Constitution and art. 1 of the Massachusetts Declaration of Rights, because it prohibits corporations from making political contributions without also prohibiting other entities, like unions and nonprofit organizations, from doing so.

The plaintiffs moved for a preliminary injunction against the enforcement of § 8.  A Superior Court judge denied the motion, finding that the plaintiffs were unable to show a likelihood of success on the merits.  Following discovery, the parties filed cross motions for summary judgment.  Another Superior Court judge denied the plaintiffs' motion and granted OCPF's motion.  As to the plaintiffs' free speech and association claim, the judge noted that in Beaumont, 539 U.S. at

154-155, 162-163, the United States Supreme Court rejected a constitutional challenge to the Federal ban on corporate contributions, holding that it was justified by the government's important interest in preventing corruption and the appearance of corruption.  The judge concluded that, under that controlling precedent, § 8 was not unconstitutional under the First Amendment because its ban on corporate contributions is "closely drawn to serve the State's interest in preventing corruption or the appearance of corruption."  He also concluded that arts. 16 and 19 of the Massachusetts Declaration of Rights grant a corporation no greater rights to make political contributions than the First Amendment.  As to the plaintiffs' equal protection claim, the judge concluded that, because the plaintiffs had failed to demonstrate that corporations and unions are similarly situated, § 8 did not violate the equal protection clause of the Fourteenth Amendment or its parallel in art. 1.  The plaintiffs appealed from the judge's grant of summary judgment, and we allowed their application for direct appellate review.

Discussion.  We review a decision to grant summary judgment de novo.  See Twomey v. Middleborough, 468 Mass. 260, 267 (2014).  "[W]here both parties have moved for summary judgment, the evidence is viewed in the light most favorable to the party

against whom judgment is to enter" (citation omitted), in this case, the plaintiffs.  Id.

1.  Free speech and association claim.  The corporations claim that § 8 violates their rights of free speech and association under both the First Amendment and arts. 16 and 19. In interpreting the United States Constitution, we are of course bound by the decisions of the United States Supreme Court, and we "can neither add to nor subtract from the mandates of the United States Constitution."  Commonwealth v. Cote, 386 Mass. 354, 360-361 (1982), quoting North Carolina v. Butler, 441 U.S. 369, 376 (1979).  We are, however, "free to interpret [S]tate constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution."  Goodridge v. Department of Pub. Health, 440 Mass. 309, 328 (2003), quoting Arizona v. Evans, 514 U.S. 1, 8 (1995).  We must therefore first consider whether § 8 is constitutional under the First Amendment, as interpreted by the Supreme Court.  If it is, we must then consider whether our Declaration of Rights is more protective of corporate contributions than the First Amendment and, if so, whether § 8 complies with that more protective constitutional standard.

a.  First Amendment.  "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established in our

Constitution." Buckley v. Valeo, 424 U.S. 1, 14 (1976) (per curiam). For this reason, "[t]he First Amendment affords the broadest protection to such political expression." Id. And because, in today's world, the communication of political views and opinions -- whether by distributing pamphlets, or through mass media -- almost inevitably costs money, see id. at 19, laws that limit political spending must be recognized as "operat[ing] in an area of the most fundamental First Amendment activities," id. at 14. At the same time, such limits are also an integral feature of campaign finance laws in this State and across the nation, designed to diminish the risk of government corruption, as well as the appearance of such corruption.

Political contributions from corporations are prohibited not only under Massachusetts law, G. L. c. 55, § 8, but also under Federal law, 52 U.S.C. § 30118(a), as well as under the laws of twenty-one other States.[4] See National Conference of State Legislatures, State Limits on Contributions to Candidates, 2017-2018 Election Cycle (June 27,2017). In Beaumont, 539 U.S.

---

[4] See Alaska Stat. § 15.13.074(f); Arizona Rev. Stat. § 16-916(A); Ark. Code Ann. § 7-6-203; Colo. Rev. Stat. § 1-45-103.7; Conn. Gen. Stat. § 9-613; Iowa Code § 68A.503; Ky. Rev. Stat. Ann. §§ 121.025, 121.035; Mich. Comp. Laws § 169.254; Minn. Stat. § 211B.15; Mo. Const. art. VIII, § 23.3(3)(a); Mont. Code Ann. § 13-35-227; N.C. Gen. Stat. Ann. § 163A-1430; N.D. Cent. Code § 16.1-08.1-03.5; Ohio Rev. Code Ann. § 3599.03; Okla. Stat. tit. 21, § 187.2; 25 Pa. Cons. Stat. § 3253; R.I. Gen. Laws § 17-25-10.1(h); Tex. Elec. Code Ann. § 253.094; W. Va. Code § 3-8-8; Wis. Stat. § 11.1112; Wyo. Stat. Ann. § 22-25-102.

at 149, the Supreme Court rejected a constitutional challenge to the Federal ban, which prohibits corporations from making contributions to candidates running for Federal office. In doing so, the Court relied on the long-standing distinction -- first articulated in Buckley, 424 U.S. at 19-21 -- between laws that limit independent expenditures and laws that limit contributions. As the Court stated, independent expenditure limits are subject to strict scrutiny, whereas contribution limits are reviewed under a less rigorous standard, and will be upheld as long as they are "'closely drawn' to match a 'sufficiently important interest.'" Beaumont, 539 U.S. at 162, quoting Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 387-388 (2000). This is because, as the Court first explained in Buckley, contribution limits encroach to a lesser extent on First Amendment interests than independent expenditure limits: whereas independent expenditures are themselves a form of political expression, lying "at the core . . . of the First Amendment freedoms," Buckley, 424 U.S. at 39, quoting Williams v. Rhodes, 393 U.S. 23, 32 (1968), a contribution is merely "a general expression of support for the candidate and his views, [which] does not communicate the underlying basis for the support." Buckley, 424 U.S. at 21. "[C]ontributions may result in political expression if spent by a candidate . . . to present views to the voters, [but] the transformation of contributions

into political debate involves speech by someone other than the contributor." Id. Thus, although limits on independent expenditures "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached," id. at 19, limits on contributions "entail[] only a marginal restriction upon the contributor's ability to engage in free communication." Id. at 20-21.

This core distinction between independent expenditures and contributions has become a "basic premise" of the Court's jurisprudence concerning campaign finance laws. Beaumont, 539 U.S. at 161. Indeed, in the four decades since Buckley was decided, the Court has declared unconstitutional almost every independent expenditure limit that has come before it. See, e.g., Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 608 (1996) (Federal limit on independent expenditures by political parties); Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 263 (1986) (Federal ban on corporate independent expenditures as applied to nonprofit corporation); Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 501 (1985) (Federal limit on independent expenditures by political committees); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 795 (1978) (Massachusetts's ban on corporate independent

expenditures in connection with initiative petition).  In contrast, the Court has upheld most contribution limits.  See, e.g., Nixon, 528 U.S. at 381-382 (Missouri's contribution limits); California Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182, 184-185 (1981) (Federal limit on contributions to multicandidate political committees).  Cf. Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 447, 465 (2001) (Colorado Republican) (upholding Federal coordinated expenditure limits by analogy to contribution limits).[5]

The Court in Beaumont, 539 U.S. at 161, recognizing that contributions, unlike independent expenditures, "lie closer to the edges than to the core of political expression," held that the Federal ban on corporate contributions was subject only to "relatively complaisant review under the First Amendment." Applying this standard of review, the Court concluded that the Federal ban served four important government interests:  First, the ban operated to "preven[t] corruption [and] the appearance of corruption."  Id. at 154, quoting National Conservative

---

[5] One notable exception to this pattern was the Court's decision in Austin v. Michigan State Chamber of Commerce, 494 U.S. 652, 654-655 (1990), where the Court upheld a Michigan statute prohibiting corporations from making independent expenditures in connection with State elections.  The Court later overruled this decision in Citizens United v. Federal Election Comm'n, 558 U.S. 310, 365 (2010).

Political Action Comm., 470 U.S. at 496-497. Second, prohibiting corporations from making contributions to candidates also protected the interests of dissenting shareholders who did not support the same candidates. Beaumont, supra. Third, a ban on corporate contributions would prevent individuals from using corporations as vehicles to circumvent valid limits on individual contributions. Id. at 155. And fourth, the ban served to "counter . . . the misuse of corporate advantages," combatting not only quid pro quo corruption but also the risk that corporations, with their unique ability to accumulate wealth, would thereby wield "undue influence [over] an officeholder's judgment." Id. at 155-156, quoting Colorado Republican, 533 U.S. at 440-441. Having concluded that the ban served sufficiently important interests, the Court also concluded that the ban was "closely drawn" to meet those interests, noting that it was not "a complete ban" on corporate political expression, because Federal law still permitted corporations to participate in the electoral process by establishing, administering, and soliciting contributions through a PAC. Beaumont, supra at 162-163.

Even though the Supreme Court declared in Beaumont, id. at 163, that an absolute ban on corporate contributions is constitutional under the First Amendment, the plaintiffs urge us nevertheless to rule that § 8 violates that amendment. "We are

not free," however, "to construe the First Amendment as creating constitutional protection broader than that established by the Supreme Court." Matter of Roche, 381 Mass. 624, 631 n.8 (1980). It is a well-established principle that, where a Supreme Court precedent "has direct application in a case," lower courts must follow that precedent, even if it were "to rest on reasons rejected in some other line of decisions." Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989). Although the landscape of campaign finance law has changed significantly since Beaumont -- most notably because of the Supreme Court's decision in Citizens United v. Federal Election Comm'n, 558 U.S. 310 (2010) -- Beaumont remains "the law of the land until the Supreme Court decides otherwise," and we are bound to follow it. Commonwealth v. Runyan, 456 Mass. 230, 234 (2010), overruled on another ground, Commonwealth v. Reyes, 464 Mass. 245, 256 (2013).

In Citizens United, 558 U.S. at 365, the Court declared unconstitutional a Federal law that banned corporations from making independent expenditures, emphasizing that, under the First Amendment, the government may not restrict speech "on the basis of the speaker's corporate identity." Applying strict scrutiny, id. at 340, the Court concluded that the law was unconstitutional because it did not serve a sufficiently compelling interest. Id. at 365. In doing so, the Court

overruled earlier decisions where it had taken a broader view of the government interests that could support restrictions on corporate political spending.  Id. at 365-366.  The Court declared that the only sufficiently compelling interest that could justify a restriction on political spending was the government's interest in preventing corruption or the appearance of corruption.[6]  See id. at 356-362.  Moreover, the Court defined

---

[6] As earlier stated, in Federal Election Comm'n v. Beaumont, 539 U.S. 146, 154-156 (2003), the Court identified four important government interests that supported the ban on corporate political contributions.  In Citizens United, 558 U.S. at 361-362, the Court repudiated two of these interests, declaring that the government could not restrict corporate political spending in order to protect dissenting shareholders, or in order to combat the distorting influence that corporations, with their accumulated wealth, could wield over the political process, id. at 348, quoting Austin, 494 U.S. at 660.  See Citizens United, 558 U.S. at 348-356.  The Court reaffirmed, however, that the government may restrict corporate political spending in furtherance of its interest in preventing corruption or the appearance of corruption.  Id. at 356-357.  The Court did not speak of the fourth important government interest identified in Beaumont -- that is, the government's interest in preventing individuals from circumventing valid limits on individual contributions by funneling the contributions through a corporation.  Beaumont, 539 U.S. at 155.  We do not interpret the Court's silence as a repudiation of this important government interest, especially where it is so closely related to the government interest in preventing corruption and the appearance of corruption.  See Ognibene v. Parkes, 671 F.3d 174, 195 n.21 (2d Cir.), cert. denied, 567 U.S. 935 (2012) ("Citizens United . . . does not disturb the validity of the anti-circumvention interest"); Thalheimer v. San Diego, 645 F.3d 1109, 1124-1125 (9th Cir. 2011) ("[T]he anti-circumvention interest is part of the familiar anti-corruption rationale . . . .  [N]othing in the explicit holdings or broad reasoning of Citizens United . . . invalidates the anti-circumvention interest in the context of limitations on direct

corruption narrowly, limiting it to "quid pro quo corruption" -- that is, the exchange of "dollars for political favors" -- and rejected the view that corruption could also take the form of disproportionate influence over or access to elected officials. Id. at 359, quoting National Conservative Political Action Comm., 470 U.S. at 497.

The Court in Citizens United did not, however, overrule its decision in Beaumont. Indeed, the majority opinion did not even cite Beaumont. Moreover, Citizens United left much of the reasoning in Beaumont undisturbed. In Citizens United, 558 U.S. at 345, 356-359, the Court reaffirmed the key distinction between contributions and independent expenditures, emphasizing that contributions present a special risk of quid pro quo corruption because, unlike independent expenditures, they are coordinated with candidates. See id. at 357. For that reason, the Court recognized that contribution limits are "an accepted means to prevent quid pro quo corruption." Id. at 359. The Court also made clear that its analysis in Citizens United was specific to independent expenditure limits; it specifically did not "reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny." Id. See McCutcheon v.

candidate contributions"). Cf. McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 218-221(2014) (plurality opinion) (government has interest in preventing circumvention of contribution limits).

Federal Election Comm'n, 572 U.S. 185, 196-197 (2014) (plurality opinion) (reiterating different standards of review for contribution limits and independent expenditure limits).

To our knowledge, every Federal circuit court that has considered a constitutional challenge to laws banning corporate contributions since Citizens United has applied the controlling precedent in Beaumont and concluded that the laws were constitutional under the First Amendment.  See, e.g., Iowa Right to Life Comm., Inc. v. Tooker, 717 F.3d 576, 601 (8th Cir. 2013), cert. denied, 572 U.S. 1046 (2014); Minnesota Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 877-880 (8th Cir. 2012); United States v. Danielczyk, 683 F.3d 611, 615-619 (4th Cir. 2012), cert. denied, 568 U.S. 1193 (2013); Ognibene v. Parkes, 671 F.3d 174, 194-197 (2d Cir. 2011), cert. denied, 567 U.S. 935 (2012); Thalheimer v. San Diego, 645 F.3d 1109, 1124-1126 (9th Cir. 2011).  Cf. Wagner v. Federal Election Comm'n, 793 F.3d 1, 5-32 (D.C. Cir. 2015), cert. denied sub nom. Miller v. Federal Election Comm'n, 136 S. Ct. 895 (2016) (upholding ban on contributions by government contractors); Yamada v. Snipes, 786 F.3d 1182, 1204-1207 (9th Cir. 2015), cert. denied sub nom. Yamada v. Shoda, 136 S. Ct. 569 (2015) (same); Green Party of Conn. v. Garfield, 616 F.3d 189, 198-205 (2d Cir. 2010) (same).

The plaintiffs contend that, even if we recognize Beaumont as controlling precedent (which we do), and apply its "closely

drawn" standard of review (which we will), we should nonetheless conclude that § 8 violates their First Amendment rights. In support of this contention, the plaintiffs proffer two arguments.

First, they argue that § 8 does not advance a sufficiently important interest, because OCPF has failed to demonstrate that the ban on corporate political contributions is necessary to prevent quid pro corruption or the appearance of quid pro quo corruption. They contend that, to demonstrate the constitutionality of such a ban, OCPF would need to present evidence of corporate contributions leading to quid pro quo corruption in Massachusetts. But imposing such an evidentiary burden on OCPF would be both unrealistic and unnecessary.

It would be unrealistic because corporate political contributions have been banned under Massachusetts law for over a century. Cf. Wagner, 793 F.3d at 14 ("Of course, we would not expect to find -- and we cannot demand -- continuing evidence of large-scale quid pro quo corruption or coercion involving federal contractor contributions [where] such contributions have been banned since 1940"). We cannot demand that OCPF provide evidence of what would happen in a "counterfactual world" where § 8 does not exist. McCutcheon, 572 U.S. at 219 (plurality opinion). See Colorado Republican, 533 U.S. at 457 (recognizing "difficulty of mustering evidence to support long-enforced

statutes" because "there is no recent experience" without them).
Cf. Burson v. Freeman, 504 U.S. 191, 208 (1992) (plurality
opinion) ("The fact that these laws have been in effect for a
long period of time . . . makes it difficult" to demonstrate
"what would happen without them").  All we can ask is "whether
experience under the present law confirms a serious threat of
abuse."  McCutcheon, supra, quoting Colorado Republican, supra.

And here, experience confirms that, if corporate
contributions were allowed, there would be a serious threat of
quid pro quo corruption.  In Buckley, 424 U.S. at 27, the
Supreme Court noted that, although actual instances of quid pro
quo corruption can be difficult to detect, "the deeply
disturbing" political scandals of the 1970s "demonstrate[d] that
the problem is not an illusory one."  Sadly, the risk of quid
pro quo corruption is no less illusory in Massachusetts.  In
just the last decade, several Massachusetts politicians have
been convicted of crimes stemming from bribery schemes intended
to benefit corporations.  See, e.g., United States v. McDonough,
727 F.3d 143, 147 (1st Cir. 2013), cert. denied, 571 U.S. 1177
(2014); United States v. Turner, 684 F.3d 244, 246 (1st Cir.),
cert. denied, 568 U.S. 1018 (2012); United States v. Wilkerson,
675 F.3d 120, 121 (1st Cir. 2012).  In addition, the record here
shows that OCPF has prosecuted several cases involving
corporations that sought to circumvent § 8 by making

contributions through individual employees, who were later reimbursed with corporate funds. Such schemes indicate that, if not for § 8, the inverse also would be possible, with individuals circumventing the limits on their own political contributions "by diverting money through . . . corporation[s]." Beaumont, 539 U.S. at 155. See id. ("experience 'demonstrates how candidates, donors, and parties test the limits of the current law, and . . . how contribution limits would be eroded if inducement to circumvent them were enhanced'" [citation omitted]).[7]

It would also be unrealistic for a court to require the Legislature to wait for evidence of widespread quid pro quo corruption resulting from corporate contributions before taking steps to prevent such corruption. "There is no reason to require the [L]egislature to experience the very problem it fears before taking appropriate prophylactic measures." Ognibene, 671 F.3d at 188.

---

[7] Under G. L. c. 55, an individual may not contribute more than (1) a total of $1,000 per year to a candidate or candidate's committee, (2) an aggregate of $5,000 per year to a political party or political committees associated with such party, and (3) $500 per year to a political action committee (PAC), other than an independent expenditure PAC. G. L. c. 55, § 7A (a) (1)-(3); 970 Code Mass. Regs. § 1.04(12) (2018). There is no limitation on the amount that may be contributed to an independent expenditure PAC. See 970 Code Mass. Regs. § 2.17(4) (2018).

Apart from being unrealistic, requiring OCPF to provide recent examples of quid pro corruption resulting from corporate contributions is also unnecessary because we need not insist on evidence of <u>actual</u> corruption when the government also has an important interest in preventing the <u>appearance</u> of corruption. See <u>id</u>. ("[T]o require evidence of actual scandals for contribution limits would conflate the interest in preventing actual corruption with the separate interest in preventing apparent corruption"). See also <u>Buckley</u>, 424 U.S. at 27 ("the impact of the appearance of corruption" is "[o]f almost equal concern as the danger of actual quid pro quo arrangements"). It requires "no great leap of reasoning" for us to infer that a ban on corporate contributions would counter at least the appearance of quid pro quo corruption. <u>Green Party of Conn</u>., 616 F.3d at 200. If corporate contributions were permitted, every time a political decision was made that helped or hurt a corporation's interests, members of the public might wonder if the corporation's political contributions -- or lack thereof -- played a role in the decision.

Both history and common sense have demonstrated that, when corporations make contributions to political candidates, there is a risk of corruption, both actual and perceived. See <u>Florida Bar</u> v. <u>Went For It, Inc</u>., 515 U.S. 618, 628 (1995), quoting <u>Burson</u>, 504 U.S. at 211 (speech restrictions can be justified

"based solely on history, consensus, and 'simple common sense'" [citation omitted]). We conclude that § 8 advances the "sufficiently important interest" in preventing quid pro quo corruption and its appearance, and in preventing the circumvention of individual contribution limits through corporations.

The plaintiffs' second argument is that, even if § 8 does advance those important interests, it is not closely drawn for that purpose. The plaintiffs claim that § 8 is at once both overinclusive and underinclusive. It is overinclusive, they contend, because it is an outright ban on corporate contributions, when there are other, less restrictive options -- such as a contribution ceiling, or disclosure requirements -- that could also further those important interests. The Supreme Court rejected a similar argument in Beaumont, 539 U.S. at 162-163, concluding that the equally comprehensive Federal ban on corporate contributions was nevertheless closely drawn.

The plaintiffs seek to distinguish this case from Beaumont, arguing that in Beaumont, id. at 163, the Court was able to reach this conclusion only because Federal law "allow[s] corporations 'to establish and pay the administrative expenses of [PACs]'" (citation omitted), whereas under Massachusetts law corporations are prohibited from doing so. The plaintiffs contend that, in Beaumont, the Court required as an "essential

constitutional minimum" that corporations be allowed to establish and administer a PAC. But in Beaumont, supra at 162-163, the Court noted the existence of a corporate-controlled "PAC option," not to suggest that it was a constitutionally mandated minimum, but rather to illustrate that corporations still had meaningful opportunities to participate in the political process.

Importantly, Beaumont was decided seven years before Citizens United, when Federal law still prohibited corporations from making independent expenditures. See Beaumont, supra. at 149. In Beaumont, the Court singled out the PAC option because, at that time, it was one of the most important outlets for corporate speech. What the Court emphasized was that, because such outlets existed, the ban on corporate contributions was not "a complete ban" on all political expression by corporations. Id. at 162.

Here, similarly, § 8 is not "a complete ban" on corporate political expression. Beaumont, supra. Although Massachusetts law does not permit corporations to establish and administer a PAC, it has, since Citizens United, permitted corporations to engage in a significant form of political expression that was not allowed when Beaumont was decided -- that is, to make unlimited independent expenditures as well as unlimited contributions to independent expenditure PACs. See G. L. c. 55,

§§ 18A, 18C, 18G. See also St. 2014, c. 210, §§ 4, 20-21, 25 (amending G. L. c. 55, §§ 1, 18A, 18C, 18G). And predictably, OCPF records indicate that independent expenditures in connection with State elections have risen sharply since the ban was lifted. See OCPF Reports, Post Election 2016, at 2 (2016) (independent expenditures in 2016 State election approximately fifty per cent higher than in 2012 State election). Where corporations in Massachusetts are free to spend as much money as they would like independently advocating for their preferred candidates, or to contribute to an independent expenditure PAC, we cannot conclude that § 8 denies corporations the opportunity meaningfully to participate in the political process. See Thalheimer, 645 F.3d at 1125 ("[the] ability to directly contribute $500 to a candidate pales in significance to [the contributor's] ability to make unlimited independent expenditures . . . supporting or opposing candidates").

Nor are we persuaded that § 8 must be invalidated because the government has the less restrictive option of regulating through disclosure requirements. In Buckley, 424 U.S. at 28, the Court defended Federal contribution limits against similar arguments, concluding that "Congress was surely entitled to conclude that disclosure was only a partial measure," and that contribution limits were "a necessary legislative concomitant to deal with the reality or appearance of corruption." Here, too,

the Legislature was entitled to conclude that disclosure on its own would be insufficient to meet the government's anticorruption interest.

Having argued that § 8 is not closely drawn, and is therefore unconstitutional, because it restricts too much speech, the plaintiffs also argue that it is not closely drawn, and is therefore unconstitutional, because it restricts too little. They contend that § 8 is underinclusive, because, unlike the Federal law upheld in Beaumont, 539 U.S. at 157, which barred both corporations and unions from making contributions, § 8 applies to corporations but not to unions. The plaintiffs suggest that, because § 8 does not also regulate unions, it is a "discriminatory contribution ban[]" that regulates only certain speakers and thereby impermissibly restricts speech based on viewpoint. See Citizens United, 558 U.S. at 340 ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content").

As the Supreme Court has recognized, "[i]t is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging too little speech." Williams-Yulee v. Florida Bar, 135 S. Ct. 1656, 1668 (2015). The government is not required to regulate speech to the constitutionally permitted maximum; "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" Id., quoting R.A.V. v. St.

Paul, 505 U.S. 377, 387 (1992). See Wagner, 793 F.3d at 29 ("a regulation is not fatally underinclusive . . . simply because an alternative regulation, which would restrict more speech or the speech of more people, could be more effective" [citation omitted]). Rather, we consider whether a restriction on speech is underinclusive only to the extent that such underinclusiveness "reveal[s] that a law does not actually advance" a sufficiently important interest, Williams-Yulee, supra, citing Smith v. Daily Mail Publ. Co., 443 U.S. 97, 104-105 (1979), or "raise[s] 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" Williams-Yulee, supra, quoting Brown v. Entertainment Merchants Ass'n, 564 U.S. 786, 802 (2011). We have already concluded that § 8 advances an important anticorruption interest. Thus, § 8 cannot violate the First Amendment for underinclusiveness unless the failure to include other entities within its scope demonstrates that preventing corruption and the appearance of corruption is a mere pretext for the prohibition against political contributions, and that its true purpose is to silence the political speech of business corporations, professional corporations, partnerships, and limited liability partnerships, while favoring the political viewpoints of those entities that fall outside its scope.

There is nothing in the record suggesting that the Legislature acted with this impermissible intent. Without citing any legislative history, the plaintiffs appear to claim that the true legislative purpose in enacting § 8 and its subsequent amendments was to favor labor unions at the expense of corporations. But there is no evidence to support this claim. Unions are not the only entities excluded from the scope of § 8; nonprofit corporations and unincorporated trade associations are also not included. If the Legislature intended § 8 to accomplish viewpoint discrimination against businesses, one would certainly have expected it to include trade associations within its prohibition. Here, the Legislature has an important interest in preventing corruption and its appearance, which it seeks to advance through § 8. The fact that § 8 focuses on corruption stemming from corporate contributions -- "rather than every conceivable instance" of corruption -- does not call this into doubt. Ognibene, 671 F.3d at 191. See, e.g., Wagner, 793 F.3d at 32 (Federal law banning contributions from individual government contractors but not from other entities or individuals with government contracts is not "fatally underinclusive"); Ognibene, supra at 191-192 (municipal law limiting contributions from individuals or entities "doing business" with government but not from certain labor organizations is not underinclusive). After all, the

Legislature "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." Williams-Yulee, 135 S. Ct. at 1668. We decline to declare § 8 fatally underinclusive merely "because it might have gone farther than it did." Buckley, 424 U.S. at 105, quoting Roschen v. Ward, 279 U.S. 337, 339 (1929).[8]

---

[8] Justice Kafker's concurrence takes issue with our discussion of underinclusiveness, apparently because we fail to adequately address issues that he concedes we "[u]ltimately . . . cannot base our decision on." Post at    . The concurrence faults us for failing "to explore the complexities of Supreme Court case law regarding differential treatment of business corporations in the context of direct contributions," post at    , and in particular faults us for failing to discuss the Supreme Court's decision in Austin, 494 U.S. at 652, post at    .

The reason we do not rely on Austin is quite simple: Austin has been overruled. In Citizens United, 558 U.S. at 365, the Supreme Court expressly stated: "Austin should be and now is overruled." The concurrence seems to think that there is some uncertainty on this front, contending that -- because it is "far from clear" whether the reasoning in Austin may still be relied on, post at    -- we must take Austin into account. But if the Supreme Court had intended to overrule only certain portions of Austin, it would have done so. In fact, in Citizens United, 558 U.S. at 365-366, the Court specifically overruled only portions of its decision in McConnell v. Federal Election Comm'n, 540 U.S. 93 (2003), but overruled Austin without any such qualification. It may very well be that some of the reasoning in Austin -- a case about independent expenditure limits -- remains viable in the context of contribution limits, as the concurrence suggests. Post at    . But to say so would be speculative, and we decline to base our decision on speculation.

Rather than rely on a precedent that has been expressly overruled, we follow the approach that the Supreme Court has taken more recently, in Williams-Yulee v. Florida Bar, 135 S.

For all of these reasons, we conclude that § 8 is constitutional under the First Amendment.

b. <u>Arts. 16 and 19 of the Massachusetts Declaration of Rights</u>. Having concluded that § 8 is constitutional under the First Amendment of the United States Constitution, we must now consider whether it is also constitutional under arts. 16 and 19 of the Massachusetts Declaration of Rights.[9] As earlier stated, as the final arbiter regarding the interpretation of our State constitution, this Court has "the inherent authority" to declare

_____

Ct. 1656, 1668-1670 (2015), when analyzing underinclusiveness under the First Amendment. Again, because the First Amendment does not require the government to restrict as much speech as it permissibly can, we consider whether a restriction is underinclusive only to the extent that it raises doubts about whether the restriction does in fact advance a sufficiently important interest or indicates that the government is acting with an impermissible purpose. <u>Id</u>. at 1668. The concurrence seems to take the view that the "differential treatment" of corporations and unions, <u>post</u> at    , may render § 8 impermissibly underinclusive. But "differential treatment" on its own does not render a law unconstitutional under the First Amendment. See, e.g., <u>Wagner</u> v. <u>Federal Election Comm'n</u>, 793 F.3d 1, 32 (D.C. Cir. 2015), cert. denied, <u>Miller</u> v. <u>Federal Election Comm'n</u>, 136 S. Ct. 895 (2016); <u>Ognibene</u>, 671 F.3d at 191-192. The question is whether the exclusion of entities such as unions, nonprofit corporations, and unincorporated trade associations from its scope suggests that § 8 does not advance a legitimate anticorruption interest, but instead serves the illegitimate purpose of discriminating against the viewpoints of corporations. For the reasons already stated, we conclude that it does not.

[9] Article 16 of the Massachusetts Declaration of Rights provides, in relevant part, that "[t]he right of free speech shall not be abridged." Article 19 provides that "[t]he people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good."

that our State Constitution affords broader protection to individual rights than does the United States Constitution. Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 558 (2012). This does not mean, however, that we must "exercise [that authority] at every turn." Id. at 559. Historically, we have interpreted the protections of free speech and association under our Declaration of Rights to be "comparable to those guaranteed by the First Amendment." Opinion of the Justices, 418 Mass. 1201, 1212 (1994). We see no reason to conclude that art. 16 or 19 gives corporations greater rights of political participation than they enjoy under the First Amendment to the United States Constitution. We therefore conclude that § 8 is constitutional under arts. 16 and 19 of the Massachusetts Declaration of Rights.

2. Equal protection claim. The plaintiffs claim that § 8 violates their rights to equal protection for the same reasons they claim that § 8 was underinclusive under the First Amendment: because it prohibits corporations from making contributions, while allowing unions and nonprofit organizations to do so. But this time, the plaintiffs seek to avail themselves of a more rigorous standard of review, contending that -- although under the First Amendment, § 8 need only be "closely drawn" to advance a "sufficiently important interest," Beaumont, 539 U.S. at 162 -- under equal protection principles,

it is subject to strict scrutiny, and therefore must be "narrowly tailored" to serve a "compelling interest."  See Citizens United, 558 U.S. at 340.  In essence, the plaintiffs seek, by reframing their First Amendment challenge, to effect an end run around the Supreme Court's well-established distinction between independent expenditure limits, which trigger strict scrutiny, and contribution limits, which do not.

In Wagner, 793 F.3d at 32, the United States Court of Appeals for the District of Columbia Circuit rejected precisely this kind of "doctrinal gambit."  The court there considered a comparable equal protection claim in a case where individual Federal government contractors challenged the constitutionality of a Federal law that barred them from making Federal campaign contributions while they negotiate or perform Federal contracts. Id. at 3, 32-33.  After rejecting the plaintiffs' First Amendment challenge, the court addressed the plaintiffs' claim that the Federal law violated their rights under the equal protection clause of the Fifth Amendment because it applied to individual government contractors but not to other, "similarly situated persons," such as regular government employees.  Id. at 32.  The court declined to apply strict scrutiny to the Federal law, explaining:

> "Although the Court has on occasion applied strict scrutiny in examining equal protection challenges in cases involving First Amendment rights, it has done so only when a First

Amendment analysis would itself have required such scrutiny.  There is consequently no case in which the Supreme Court has employed strict scrutiny to analyze a contribution restriction under equal protection principles. . . .  This will not be the first. . . .

"[A]lthough equal protection analysis focuses upon the validity of the classification rather than the speech restriction, 'the critical questions asked are the same.' We believe that the same level of scrutiny . . . is therefore appropriate in both contexts. . . .

"[I]n a case like this one, in which there is no doubt that the interests invoked in support of the challenged legislative classification are legitimate, and no doubt that the classification was designed to vindicate those interests rather than disfavor a particular speaker or viewpoint, the challengers 'can fare no better under the Equal Protection Clause than under the First Amendment itself'" (footnote and citations omitted).

Id. at 32-33.

We adopt the court's reasoning here.  For equal protection purposes, strict scrutiny is warranted only where a law implicates a suspect class or burdens a fundamental right.  See Goodridge, 440 Mass. at 330.  Corporations are not a suspect class.  And, although the rights to free speech and association are fundamental, see Buckley, 424 U.S. at 14, the Supreme Court has already explicitly stated that, because contributions "lie closer to the edges than to the core of political expression," contribution limits do not sufficiently burden those rights to warrant strict scrutiny.  Beaumont, 539 U.S. at 161.  See Buckley, supra at 25.  Thus, where the challenged law is a limit on contributions, as here, and where that law does not implicate

a suspect class, we follow the Supreme Court's precedents and apply the familiar "closely drawn" standard, regardless of whether the challenge sounds under the First Amendment or under equal protection principles. And, under this standard, we conclude that § 8 is constitutional under equal protection principles, for the same reasons that it is constitutional under the First Amendment.[10]

---

[10] Because it is not necessary to our decision, we do not decide whether business corporations and the other profit-making entities within the scope of § 8 are similarly situated to or treated differently from other entities, such as unions or nonprofit organizations, that are outside its scope. See Matter of Corliss, 424 Mass. 1005, 1006 (1997) ("One indispensable element of a valid equal protection claim is that individuals who are similarly situated have been treated differently"). We note that, under current Massachusetts law, it is not clear to what extent unions and nonprofit organizations are free to make political contributions.

This is because, separate from its ban on corporate contributions, G. L. c. 55 also regulates certain kinds of organizations known as "political committees." As defined in G. L. c. 55, § 1, a "political committee" includes any "organization or other group of persons . . . which receives contributions or makes expenditures for the purpose of influencing the nomination or election of a candidate, or candidates . . . ." If, under this broad definition, a union or nonprofit organization that makes even a nominal political contribution is considered a political committee, such entities effectively would be prohibited from making any contribution because, once characterized as a political committee, they would be required not only to meet burdensome disclosure requirements, but also to dedicate their resources exclusively to their political purpose, meaning that they could no longer serve their intended purposes as a union or nonprofit organization. See 970 Code Mass. Regs. § 2.06(6)(b) (2018) ("No political committee . . . may pay or expend money or anything of value unless such

We therefore conclude that § 8 does not violate the equal protection clause of the Fourteenth Amendment.  Nor does it violate the plaintiffs' entitlement to equal protection under art. 1.  See <u>Dickerson</u> v. <u>Attorney Gen</u>., 396 Mass. 740, 743 (1986) ("For the purpose of equal protection analysis, our standard of review under . . . the Massachusetts Declaration of

---

transaction will enhance the political future of the candidate or principle on whose behalf the committee was organized").

In 1988, OCPF issued guidance in the form of an interpretive bulletin, explaining that a nonpolitical organization -- that is, an organization that does not solicit or receive funds for any political purpose -- will not be considered a political committee as long as it does not make "more than incidental" political expenditures, defined as those "exceed[ing], in the aggregate, . . . either $15,000 or 10 percent of [the] organization's gross revenues . . . , whichever is less" (emphasis omitted).  OCPF, Interpretive Bulletin, OCPF-IB-88-01 (Sep. 1988) (rev. May 9, 2014).  Thus, under OCPF's interpretation, a union or nonprofit organization can spend up to $15,000 or ten per cent of its gross revenues, whichever is less, without triggering the regulations applicable to political committees.

An administrative bulletin, as opposed to a regulation that has benefited from the full rulemaking process, with opportunity for notice and comment, see G. L. c. 55, §§ 2-3, is entitled to substantial deference but it is not a promulgated regulation that carries the force of law.  See <u>Global NAPs, Inc</u>. v. <u>Awiszus</u>, 457 Mass. 489, 496-497 (2010) ("although [administrative agency's guidelines] are entitled to substantial deference, they do not carry the force of law").  The question whether OCPF's interpretive bulletin accurately interprets c. 55 has not, to our knowledge, been addressed in a court of law. Because it is not necessary to our decision, because it was not addressed by the judge or briefed by the parties, and because a ruling would have substantial consequence on entities that are not parties to this action, we decline to address it here.

Rights is the same as under the Fourteenth Amendment to the Federal Constitution").

Conclusion. For the reasons stated, the order denying the plaintiffs' motion for summary judgment and allowing OCPF's cross-motion for summary judgment is affirmed.

So ordered.

BUDD, J. (concurring).  I agree with the court's holding.  However, I write separately to describe more broadly the interest in "limit[ing] 'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large . . . financial contributions' to particular candidates."  McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 207 (2014) (plurality opinion), quoting Buckley v. Valeo, 424 U.S. 1, 27 (1976).  In Massachusetts, this interest is rooted in the Declaration of Rights of the Constitution of the Commonwealth and supports the Commonwealth's statutory scheme of campaign contribution regulation as a whole.  Under art. 5 of the Declaration of Rights, the Commonwealth has a constitutional interest in ensuring that its elected representatives are "substitutes and agents" of the people who act only in their interest.

1.  Role of a representative under the Constitution of the Commonwealth.  A basic principle of our Constitution (and of a republican form of government) is that representatives are to be chosen by the people to represent them and their interests.  See Part II of the Constitution of the Commonwealth.  The people, through the Constitution, established a legislative department comprised of legislators who are elected by the qualified voters inhabiting the districts that they represent.  See id. at c. 1, §§ 2,3.  The people also established an executive power

exercised by the Governor.  Id. at c. 2.  "The Governor is emphatically the Representative of the whole People, being chosen not by one Town or County, but by the People at large." An Address of the Convention for Framing a new Constitution for the State of Massachusetts Bay, to their Constituents, 13 (1780).

The Declaration of Rights further clarifies that the relationship between representatives and the people is an agency relationship.  Art. 5 provides as a right:

> "All power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times accountable to them."

See Opinion of the Justices, 160 Mass. 586, 594 (1894) (opinion of Holmes, J.) ("confidence is put in [the Legislature] as an agent . . . of its principal[, the people]").

The core of the relationship between an agent and his or her principal is a duty of loyalty that the former owes the latter:  the law "demands that the agent shall work with an eye single to the interest of his principal.  It prohibits him from receiving any compensation but his commission, and forbids him from acting adversely to his principal, either for himself or for others."  McKinley v. Williams, 74 F. 94, 95 (8th Cir. 1896).  See Attorney Gen. v. Henry, 262 Mass. 127, 132 (1928). Under art. 5, all governmental officials in the Commonwealth, as

agents of the people, are bound to "work with an eye single to the interests" of their principal, the public.[1]  McKinley, supra at 95.

_____

[1] Article 5 of the Massachusetts Declaration of Rights may recognize two valid principals whose interests a representative may advance:  a representative's constituents and the people of the Commonwealth at large.  That the Constitution may intend representatives to be agents of both is clarified by theories of representation debated at the time that the 1780 Constitution was drafted.

In the Eighteenth Century, members of the British Parliament, once elected, were generally considered not to be agents of their constituencies, but representatives of the entire nation.  William Blackstone explained that "every member, though chosen by one particular district, when elected and returned serves for the whole realm.  For the end of his coming thither is not particular, but general; not barely to advantage his constituents, but the common wealth" (emphasis in original). 1 W. Blackstone, Commentaries *155.  Arthur Onslow, who served as the Speaker of the House of Commons from 1728-1761, explained that "every Member is equally a Representative of the whole (within which, by our particular constitution, is included a Representative, not only of those who are electors, but of all the other subjects of the Crown of Great Britain at home, and in every part of the British empire, except the Peers of Great Britain) has, as I understand, been the constant notion and language of Parliament."  J. Hatsell, Precedents of Proceedings in the House of Commons 47, note (1781).  This theory of Representation justified Parliament's imposition of taxes and other laws on the colonies before the American Revolution.  R. Luce, Legislative Principles, The History and Theory of Lawmaking by Representative Government 438 (1930) (Luce).  Under the theory, a "British subject in Massachusetts Bay or Virginia was represented in Parliament just as much as if he were living in London.  The accident of voting or not voting had nothing to do with the question."  Id.

Massachusetts revolutionaries, such as Otis and the Adamses, rejected this theory, id.; art. 5 expresses that rejection.  Although the article certainly does not eliminate a representative's responsibilities to the entire Commonwealth of

2.  Campaigns for elected office.  Over the past century, the cost of running a feasible campaign for elected office, even for local positions, has increased dramatically.  See Deeley, Campaign Finance Reform, 36 Harv. J. on Legis. 547, 550-551 (1999); R. Luce, Legislative Principles, The History and Theory of Lawmaking by Representative Government, 423-425 (1930).  Most officials rely on campaign contributions to raise revenue in order to run a campaign.  This system of financing generates a discrete category of principals, that is, a donor class,[2] separate and distinct from "the people."  See art. 5; Bates v. Director of Office of Campaign & Political Fin., 436 Mass. 144,

---

Massachusetts, I believe the Massachusetts Constitution does require representatives to balance this responsibility with a consideration of and duty to advance the best interests (and perhaps expressed needs) of his or her constituents.  See art. 5.  See also art. 19 of the Massachusetts Declaration of Rights (people have right to instruct representatives); Bresler, Rediscovering the Right to Instruct Legislators, 26 New Eng. L. Rev. 355, 360 (1991).  Contrast arts. 5 and 19 with, for example, the French Constitution of 1795, which stated:  "The members of the legislative body are not representatives of the departments which have elected them, but of the whole nation, and no specific instruction shall be given them."  Luce, supra at 445.

[2] Donors making donations of one hundred dollars or more in the period before the 1996 election made up less than one per cent of the Commonwealth's eligible voters.  Bates v. Office of Campaign & Political Fin., 436 Mass. 144, 165 n.28 (2002).  The corporate plaintiffs in this case, of course, cannot be considered qualified voters at all.  See art. 3 of the Amendments to the Constitution of the Commonwealth, as amended (setting forth voter qualifications).  See also art. 8 of the Declaration of Rights (establishing elections as primary form of representative accountability).

165-166 (2002). Thus, the campaign finance system has created incentives for representatives to act not simply with the interests of the public in mind, but instead with an eye toward balancing the interests of the donors and the public, which may at times be divergent.[3]

3. General Laws c. 55. The prohibition on corporate campaign contributions set forth in G. L. c. 55, § 8, is one part of a broader scheme of statutes limiting and regulating campaign contributions set forth in that chapter. We have long held that some rights established by the Constitution may contemplate "suitable and reasonable regulations, not calculated to defeat or impair [that] right[,] . . . but rather to

---

[3] Take, for example, the comment of a congressman in 2017, who, in reference to a bill being considered in Congress, commented to members of the press: "My donors are basically saying, 'Get it done or don't ever call me again.'" GOP Lawmakers: Donors are pushing me to get tax reform done, The Hill (Nov. 7, 2017). See Here's one White House hopeful who wants to get big money out of politics, Reuters (April 18, 2015) (statement of Senator Lindsey Graham) ("We've got to figure out a way to fix this mess, because basically 50 people are running the whole show"); Michele Bachmann: The Newsmax Interview, Newsmax (June 26, 2011) (statement of Congresswoman Michele Bachmann) (describing "the corrupt paradigm that has become Washington, D.C., whereby votes continually are bought rather than representatives voting the will of their constituents . . . . That's the voice that's been missing at the table in Washington, D.C. -- the people's voice has been missing"); In Political Money Game, the Year of Big Loopholes, N.Y. Times (Dec. 26, 1996) (statement of Congressman Barney Frank) ("We are the only people in the world required by law to take large amounts of money from strangers and then act as if it has no effect on our behavior").

facilitate and secure the exercise of the right."  Capen v.
Foster, 12 Pick. 485, 492 (1832).  Article 5 guarantees the
people a right to a republic in which their representatives are
their substitutes and agents.  To the extent that the lack of
campaign finance regulation results in a system of government
where representatives are increasingly forced to "work with an
eye [not] single to the interest" of the public, McKinley, 74 F.
at 95, campaign finance regulation and the limits on campaign
contributions set forth in G. L. c. 55 may be appropriate to
preserve the representative democracy contemplated by the
framers of the Constitution ratified by the people of the
Commonwealth in 1780.[4]

---

[4] Cf. United States v. International Union United Auto.,
Aircraft and Agric. Implement Workers of Am. (UAW-CIO), 352 U.S.
567, 577-578 (1957), quoting 86 Cong. Rec. 2720 (statement of
U.S. Senator in support of limits on campaign contributions)
("We all know that money is the chief source of corruption.  We
all know that large contributions to political campaigns . . .
put the political party under obligation to the large
contributors, who demand pay in the way of legislation").

Even assuming that voters, as principals, may consent to a
representative that has a clearly disclosed conflict of interest
by electing such an individual, see 1 S. Livermore, A Treatise
on the Law of Principal and Agent 33 (1818) (principals
responsible for "consequences of making . . . [a deficient
agency] appointment"), voters would need a choice in order to
consent.  If the nature of the problem is systemic, without
regulation, voters are deprived of the ability to choose a
candidate that does not have such a conflict and may typically
be faced with a monopoly of choices that do not work with an eye
single to their interests and the interests of the Commonwealth.
See id. at 25 (without consent of principal there can be no

The prevention of criminal bribery alone does not sufficiently identify the Commonwealth's interest in its campaign contribution regulatory scheme. "[L]aws making criminal the giving and taking of bribes deal only with the most blatant and specific attempts of those with money to influence governmental action." Wagner v. Federal Election Comm'n, 793 F.3d 1, 15 (D.C. Cir. 2015), cert. denied sub nom. Miller v. Federal Election Comm'n, 136 S. Ct. 895 (2016), quoting Buckley, 424 U.S. at 27-28. Thus, I believe that the Commonwealth's campaign finance regulation may be justified not only to prevent corruption in the form of criminal bribery or the appearance of criminal bribery, but also to prevent the appearance of corruption by preserving the agency relationship between representatives and the people set forth under art. 5.[5]

---

appointment of agent; there must be "serious and free use of [the consent] power[]"). See also Bates, 436 Mass. at 165 n.28 (discussing frequency of uncontested elections).

[5] "[G]overnment regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. 'Ingratiation and access . . . are not corruption.'" McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 192 (2014) (plurality opinion), quoting Citizens United v. Federal Election Comm'n, 558 U.S. 310, 360 (2010). Of course, agents of corporations such as the plaintiffs may meet with policymakers to express their legitimate ideas and concerns regarding legislation. This freedom of expression helps policymakers refine and solidify what they believe is good policy. However, the principal-agency relationship set forth in art. 5 is broken not when a legislator is grateful to his supporters or because of access, but when an

The statute at issue in this case facilitates and helps secure the agency relationship between the people and their representatives as principals and agents, to take a step in the direction of preserving the constitutional directive that when elected officials act, their primary motivations are the interests of their principals, i.e., their constituents and the Commonwealth.[6]

The statutory scheme of G. L. c. 55, which provides for the disclosure and regulation of campaign contributions, is derivative of principles in the Massachusetts Constitution regarding the structure of our representative democracy and rights of its people. However, any encroachment on the rights of the plaintiffs under the First Amendment to the United States Constitution, even one that occurs by operation of the State Constitution, must be supported by a "sufficiently important

---

elected official takes actions that he otherwise would not have because he feels obligated to advance the interests of his donors in particular, not his constituents or the Commonwealth has a whole.

[6] I agree with the court that it is not necessary to address, in the context of this case, whether the Office of Campaign and Political Finance (OCPF)'s Interpretive Bulletin OCPF-IB-88-01 (Sept. 1988, rev. May 9, 2014) accurately interprets G. L. c. 55. Ante at note 10. I note, however, the current guidance appears to permit nonpolitical nonprofit organizations to contribute as much as $15,000 in one year directly to a single candidate. OCPF Interpretive Bulletin, supra at 4. I believe that when OCPF interprets G. L. c. 55, it should do so in light of art. 5.

interest."[7]  McCutcheon, 572 U.S. at 197 (plurality opinion),
quoting Buckley, 424 U.S. at 25.  The Commonwealth's interests
in facilitating and securing the art. 5 right to representatives
who are "substitutes and agents" of the people is "a
sufficiently important concern" and "critical . . . if
confidence in the system of representative Government is not to
be eroded to a disastrous extent."  Buckley, supra at 27,
quoting United States Civil Serv. Comm'n v. National Ass'n of
Letter Carriers, AFL-CIO, 413 U.S. 548, 565 (1973).  The
Commonwealth may limit the serious burden that, in many
instances, campaign contributions impose on the agency
relationship between the public and their representatives
because that burdened agency relationship highlights "the
appearance of corruption stemming from public awareness of the
opportunities for abuse inherent in a regime of large individual
financial contributions' to particular candidates."  McCutcheon,
572 U.S. at 207 (plurality opinion), quoting Buckley, 424 U.S.
at 27.[8]  Indeed, the interest concerns the form and character of
our representative democracy itself.

---

[7] However, principles similar to those contained in art. 5
may be implicit in the United States Constitution.  See Brown &
Martin, Rhetoric and Reality:  Testing the Harm of Campaign
Spending, 90 N.Y.U. L. Rev. 1066, 1071-1076 (2015).

[8] Additionally, the Supreme Court has increasingly
recognized that the Federal Constitution's grant of broad

Corporations such as 1A Auto, Inc., and 126 Self Storage, Inc., have free speech rights to educate and inform public discussion about issues of concern to them.  See Citizens United v. Federal Election Comm'n, 558 U.S. 310, 342 (2010); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 795 (1978).  Both entities have a First Amendment right to make unlimited independent expenditures throughout the Commonwealth to influence directly the thoughts and opinions of the voters and the public at large.  Citizens United, supra at 365-366.  See G. L. c. 55, § 18A; 970 Code Mass. Regs. §§ 1.04(12) n.1, 2.17 (2018).  However, that right does not extend so far as to

---

autonomy to States to structure their governments and adopt rules that make electoral democracy functional:

> "Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments . . . .  Indeed, the Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens. . . .  More specifically, 'the Framers of the [Federal] Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.'"

Shelby County, Ala. v. Holder, 570 U.S. 529, 543 (2013), quoting Gregory v. Ashcroft, 501 U.S. 452, 461-462 (1991).  As in voting rights cases rooted in the First Amendment, perhaps in the regulation of campaign finance, to preserve the proper function of our democratic institutions, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role[;] . . . 'as a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.'"  Burdick v. Takushi, 504 U.S. 428, 433 (1992), quoting Storer v. Brown, 415 U.S. 724, 730 (1974).

provide funds directly to candidates that cause those candidates to "work with an eye [not] single to the interest" of the people.  McKinley, 74 F. at 95.[9]

6.  Conclusion.  In Thoughts on Government (1776), John Adams explained:

> "The principal difficulty lies, and the greatest care should be employed, in constituting this representative assembly.  It should be in miniature an exact portrait of the people at large.  It should think, feel, reason, and act like them.  That it may be the interest of this assembly to do strict justice at all times, it should be an equal representation, or, in other words, equal interests among the people should have equal interests in it.  Great care should be taken to effect this, and to prevent unfair, partial, and corrupt elections.  Such regulations, however, may be better made in times of greater tranquility than the present; and they will spring up themselves naturally, when all the powers of government come to be in the hands of the people's friends.  At present, it will be safest to proceed in all established modes, to which the people have been familiarized by habit."

These principles support the court's conclusion in this case.

---

[9] Furthermore, "it may be that, in some circumstances, 'large independent expenditures pose [some of] the same dangers . . . as do large contributions.'"  Federal Election Comm'n v. Wisconsin Right To Life, Inc., 551 U.S. 449, 478 (2007) (opinion of Roberts, C.J.), quoting Buckley v. Valeo, 424 U.S. 1, 45 (1976).  See also Buckley, supra at 46 ("independent advocacy . . . does not presently appear to pose dangers . . . comparable to those identified with large campaign contributions" [emphasis added]).

KAFKER, J. (concurring). I write separately because the court does not adequately address the issue whether the law prohibiting corporate contributions is impermissibly underinclusive under the First Amendment for failing to prohibit contributions by other entities. In Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 665-666 (1990), the United States Supreme Court held that treating corporations and nonprofits differently from unions in the context of independent expenditures was constitutionally permissible. The Supreme Court has since overruled Austin, see Citizens United v. Federal Election Comm'n, 558 U.S. 310, 365 (2010), and it remains unclear whether, and to what extent, the reasoning relied on in Austin and other cases focusing on the aggregation of capital and its effect on politics may still apply in the context of direct campaign contributions.[1]

---

[1] The court, in addressing this concurrence, attempts to minimize the issue of differential treatment. Here, however, "[t]he underinclusiveness of the statute is self-evident." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 793 (1978). General Laws, c. 55, § 8, purports to target corruption and the appearance of corruption but, in application, singles out a subset of entities for regulation. Although the court attempts to dismiss the significance of such differential treatment, "[i]n the First Amendment context, fit matters." McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 218 (2014) (plurality opinion). It is not enough for the government to advance a compelling interest -- we must still assess "the fit between the stated governmental objective and the means selected to achieve that objective." Id. at 199. Yet, nowhere does the court explain why regulating

In my view, in the post-Citizens United world, the Supreme
Court clearly still emphasizes the importance of preventing quid
pro quo corruption or the appearance of such corruption in the
context of direct contributions, see McCutcheon v. Federal
Election Comm'n, 572 U.S. 185, 206-208 (2014) (plurality
opinion), and also defers to evenhanded legislative regulation
in this area.  See Buckley v. Valeo, 424 U.S. 1, 31 (1976) (per
curiam).  A uniform ban on contributions from business
corporations, nonprofits, and unions to prevent corruption or
the appearance of corruption would thus appear to be

---

corporations differently from other organizations is closely
drawn to the State's interest in preventing corruption.  The
reasons provided by the majority apply equally to unions and
nonprofits.  As discussed, the rationales that would have most
obviously supported this disparate treatment were articulated in
Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 665-666
(1990).

The court states that it does not bother to examine Austin
for the "simple" reason that Austin has been overruled.  Yet,
the court conveniently fails to mention that Austin, not Federal
Election Comm'n v. Beaumont, 539 U.S. 146 (2003), remains the
only Supreme Court case to squarely address the issue of
disparate corporate treatment in the area of political finance.
Looking solely at the court's opinion, one might assume that
Beaumont addressed a statutory scheme mirroring to our own.  It
did not.  Beaumont, supra at 154, involved a direct contribution
ban that applied uniformly to unions and corporations.  Austin,
supra, however, examined a campaign finance statute that
regulated corporations differently from unions.  Precisely
because Austin was overruled, it is all the more important to
closely examine the Supreme Court's jurisprudence to determine
whether differential treatment of business corporations may
still be permissible in the area of campaign contributions, or
if it has been foreclosed by Citizens United v. Federal Election
Comm'n, 558 U.S. 310, 365 (2010).

constitutional under existing precedent. See <u>Federal Election Comm'n</u> v. <u>Beaumont</u>, 539 U.S. 146, 157-159 (2003).

The Supreme Court has, however, rejected treating business corporations differently simply based on the substantial aggregations of wealth amassed by corporations or the advantages of the corporate structure, at least in the context of independent expenditures. See <u>Citizens United</u>, 558 U.S. at 350-351. I assume at least some of the same reasoning would apply to contributions as well, although this is less clear. Campaign finance restrictions that stem from a desire to even the political playing field by reducing corporate power would certainly be impermissible. <u>McCutcheon</u>, 572 U.S. at 207 (plurality opinion) ("it is not an acceptable governmental objective to level the playing field" [quotations and citation omitted]). The Supreme Court also vigilantly protects against viewpoint discrimination. See <u>Citizens United</u>, <u>supra</u> at 340. Differential treatment of business corporations from other entities must then be closely drawn to the permissible State interest in preventing quid pro quo corruption and the appearance of quid pro quo corruption, rather that these impermissible State interests. Separating out legitimate concerns about corruption from the apparently illegitimate concerns discussed in <u>Austin</u> to justify differential treatment, however, remains difficult.

In the instant case, the Superior Court judge provided relevant context to the enactment of Massachusetts's first campaign finance law and the possible motivation behind its passage.  As he explained:

> "While [laws banning federal officers from requesting, giving, or receiving political contributions from other officers or employees] made it more 'difficult and risky' to 'shake down' government officials to help finance political campaigns, the laws also increased office-seekers' reliance on wealthy corporations and individuals for campaign contributions, which created its own set of problems. . . .  During the 1904 presidential race, Republican candidate Theodore Roosevelt was accused of accepting large donations from corporations that expected special treatment if he was elected. . . .  Although Roosevelt denied these assertions and won the election, he was mindful of the accusations and, in 1905, during his first address to Congress, he took aim at corporations, recommending a ban on all corporate contributions, to prevent 'bribery and corruption in Federal elections.' . . .  President Roosevelt asserted that 'both the National and the several State Legislatures' should 'forbid any officer of a corporation from using the money of the corporation in or about any election,' in order to 'effective[ly] . . . stop[] the evils aimed at in corrupt practices acts.' . . .  Congress answered President Roosevelt's call in 1907 with the enactment of the Tillman Act, which banned corporations from 'mak[ing] a money contribution in connection with any election to any political office.' . . .
>
> "During the same year that Congress passed the Tillman Act, the Massachusetts Legislature enacted a state law banning certain corporations from 'pay[ing] or contribut[ing] in order to aid, promote, or prevent the nomination or election of any person to public office, or in order to aid, promote or antagonize the interests of any political party, or to influence or affect the vote on any question submitted to the voters.' . . .  Thereafter, in 1908, the Legislature passed 'An Act to prohibit the making of political contributions by business corporations,' which extended the ban to all 'business corporation[s]

incorporated under the laws of, or doing business in this commonwealth'" (citations omitted).

Given the age of the Massachusetts statute and its apparent origins in a nationwide push against the influence of big business in politics, it is difficult to discern whether the basis for the statute's differential treatment of business corporations rests on grounds considered legitimate, illegitimate, or a combination of both. It is my sense that it reflects some of the same combination of reasons articulated in Austin. The question then becomes whether a statute singling out business corporations for a ban on direct campaign contributions for such a combination of reasons remains permissible. I ultimately concur in the judgment because it is not clear to me how much of the reasoning of Austin and other Supreme Court cases such as Beaumont and Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 210 (1982) (NRWC), remain good law and how deferential the Supreme Court will be in the future to legislative choices regarding concerns about corruption even when they combine with disfavored considerations toward business corporations.

I believe the court's opinion does not adequately address the issue of underinclusion. The court focuses primarily on concerns about quid pro quo corruption stemming from business corporations to conclude that a ban on business corporation

contributions is constitutionally permissible. <u>Ante</u> at   -  .
See <u>Beaumont</u>, 539 U.S. at 163.  The ultimate issue, however, is
not simply whether contributions by business corporations may be
limited due to concerns about quid pro quo corruption or the
appearance of such corruption, but whether a statutory scheme
that bans such contributions while simultaneously permitting
contributions by other organizations, including well-endowed
nonprofit corporations and unions, is closely drawn to the
State's interest in preventing corruption and its appearance.

To justify treating business corporations differently from
unions and well-endowed nonprofits, including single issue
advocacy entities that are intensely involved in political
campaigns, the court cites selective examples of corporate
bribery scandals in Massachusetts.  See <u>ante</u> at   .  Most of
the examples, however, involve personal payments put directly
into the pockets of elected officials rather than election-
related activity or campaign contributions.  The court also
notes that the record includes several instances of corporate
campaign finance violations, but one could just as easily
provide selective examples of union and nonprofit violations.
Indeed, based simply on the record before us, unions and
nonprofits have also sought to circumvent campaign finance laws.
In 2013, a union political action committee (PAC) failed to
disclose $178,000 in expenditures in violation of State

disclosure requirements.  In 2014, the American Federation of Teachers transferred money to a PAC through a nonprofit organization, which then made independent expenditures in the Boston mayoral race, in order to illegally disguise the source of the contributions.  The same year, the Office of Campaign and Political Finance investigated another union PAC that had failed to accurately report independent expenditures and direct contributions made to candidates.  Would these few examples sufficiently justify a prohibition on direct contributions by unions or nonprofits, but not business corporations?  Of course not.  But under the court's reasoning, a few such anecdotes appear sufficient to uphold such a statutory scheme.

    The court further references a "long historical pedigree" of laws restricting the electoral participation of corporations. But the court fails to mention that laws restricting union participation in the electoral process enjoy a long-standing pedigree as well for many of the same reasons.  See United States v. International Union United Auto., Aircraft & Agric. Implement Workers of Am., 352 U.S. 567, 570-584 (1957) (UAW) (providing detailed history of Federal campaign finance laws as they apply to unions and the concerns that led to their enactment); NRWC, 459 U.S. at 208-209.  But see Citizens United, 558 U.S. at 363 (characterizing UAW as providing a "flawed historical account of campaign finance laws").  Indeed, many

States ban direct contributions from both corporations and unions,[2] while only a handful of States ban contributions from corporations alone.[3]

Rather than focusing on selective examples of campaign finance violations, I believe it is necessary to explore the complexities of Supreme Court case law regarding differential treatment of business corporations in the context of direct contributions, something the court has not done.

The appropriate level of scrutiny for evaluating a campaign finance law turns on the "importance of the political activity at issue to effective speech or political association" (quotations and citation omitted). Beaumont, 539 U.S. at 161. Restrictions on direct contributions "lie closer to the edges" of political speech than restrictions on independent expenditures. Id. Thus, while laws restricting independent expenditures receive strict scrutiny, laws restricting direct contributions need only be "closely drawn" to a sufficiently

---

[2] See Alaska Stat. § 15.13.074(f); Ariz. Rev. Stat. § 16-916(a); Ark. Const. art. 19, § 28; Colo. Const. art. XXVIII, § 3; Conn. Gen. Stat. §§ 9-601, 9-613, 9-614; Mich. Comp. Laws § 169.254; Mo. Const. art. VIII, § 23.1; Mont. Code Ann. § 13-35-227; N.C. Gen. Stat. Ann. § 163A-1430; N.D. Cent. Code §§ 16.1-08.1-01; 16.1-08.1-03.3, 16.1-08.1-.03.5(1); Ohio Rev. Code Ann. § 3599.03; Okla. Stat. tit. 21, § 187.2; 25 Pa. Cons. Stat. § 3253; R.I. Gen. Laws. § 17-25-10.1; Tex. Elec. Code Ann. § 253.094; Wis. Stat. § 11.1112; Wyo. Stat. Ann. § 22-25-102(a).

[3] See Iowa Code §§ 68A.102(17), 68A.503(1); Ky. Rev. Stat. Ann. §§ 121.025; Minn. Stat. § 211B.15; W. Va. Code § 3-8-8.

important government interest. See Buckley, 424 U.S. at 24-25; McCutcheon, 572 U.S. at 197 (plurality opinion). Although campaign finance jurisprudence is in a "state of flux" post-Citizens United, the long-standing distinction between independent expenditures and direct contributions in this regard remains good law. See Green Party of Conn. v. Garfield, 616 F.3d 189, 199 (2d Cir. 2010); McCutcheon, supra at 196-199 (plurality opinion).

When evaluating laws that restrict direct contributions, as here, courts must determine (1) whether the government has advanced a sufficiently important interest; and (2) whether the law is "closely drawn" to achieve that interest. See Buckley, 424 U.S. at 23-25; McCutcheon, 572 U.S. at 196-199 (plurality opinion). A law is not closely drawn to a stated interest if it is impermissibly over or underinclusive. See, e.g., First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 793 (1978) ("the exclusion of Massachusetts business trusts, real estate investment trusts, labor unions, and other associations undermines the plausibility of the State's purported concern for the persons who happen to be shareholders in the banks and corporations covered by [the law at issue]").

There is no doubt that the government has a sufficiently important interest in preventing corruption and the appearance of corruption and that direct contributions to political

candidates implicate that important interest.[4]  See McCutcheon,
572 U.S. at 206-207 (plurality opinion); Citizens United, 558
U.S. at 356.  Further, statutes that categorically or
evenhandedly ban large contributions from organizations remain
constitutional under existing Supreme Court precedent.  See
Beaumont, 539 U.S. at 163.  The difficult issue is differential

---

[4] The permissible interest in preventing corruption is more
precisely an interest in preventing quid pro quo corruption.
See McCutcheon, 572 U.S. 185, 207 (2014) (plurality opinion)
("Congress may target only a specific type of corruption --
'quid pro quo' corruption").  Quid pro quo corruption "captures
the notion of a direct exchange of an official act for
money. . . .  'The hallmark of corruption is the financial quid
pro quo:  dollars for political favors.'"  Id. at 1441
(plurality opinion), quoting Federal Election Comm'n v. National
Conservative Political Action Comm., 470 U.S. 480, 497 (1985).
See Buckley v. Valeo, 424 U.S. 1, 26-27 (1976) (per curiam) ("To
the extent that large contributions are given to secure a
political quid quo pro from current and potential office
holders, the integrity of our system of representative democracy
is undermined").

As mentioned, the State also has a compelling interest in
limiting "the appearance of corruption stemming from public
awareness of the opportunities for abuse inherent in a regime of
large individual financial contributions."  McCutcheon, 572 U.S.
at 207 (plurality opinion), quoting Buckley, 424 U.S. at 27.
See Buckley, supra, quoting United States Civil Serv. Comm. v.
National Ass'n of Letter Carriers, AFL-CIO, 413 U.S. 548, 565
(1973) ("Congress could legitimately conclude that the avoidance
of the appearance of improper influence 'is also critical . . .
if confidence in the system of representative Government is not
to be eroded to a disastrous extent'").  Such an appearance of
corruption "erode[s] . . . public confidence in the electoral
process."  Federal Election Comm'n v. National Right to Work
Comm., 459 U.S. 197, 208 (1982).  Both corruption and the
appearance of corruption "directly implicate 'the integrity of
our electoral process, and, not less, the responsibility of the
individual citizen for the successful functioning of that
process.'"  Id., quoting UAW, 352 U.S. at 570.

treatment, when corruption, or the risk of corruption, stems from multiple sources, but only one of which is regulated. The analysis of how "closely drawn" the law is to the State's interest in preventing corruption and its appearance requires cognizance of the breadth of that interest. That interest applies to corruption by unions and nonprofits as well as business corporations.

The primary support for differential treatment of business corporations in the area of political finance appears in Austin, 494 U.S. at 654, an independent expenditure case. There, the Supreme Court was asked to consider the constitutionality of a Michigan law that prohibited nonmedia corporations from using general treasury funds for independent expenditures in State elections, but did not prohibit unions from doing so. Id. at 655, 666. The plaintiff in Austin argued that there was no compelling interest to justify treating corporations differently from unions. See id. at 659-660. The Supreme Court held that the law was closely drawn to two compelling government interests, both of which have since been rejected in Citizens United.

First, the Supreme Court in Austin, 494 U.S. at 660, articulated a government interest in addressing the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that

have little or no correlation to the public's support for the corporation's political ideas." The Supreme Court reasoned that unions and individuals alike lacked the "significant state-conferred advantages of the corporate structure" that enhances a corporation's ability to amass wealth. Id. at 665. Thus, the State had a compelling interest in "counterbalanc[ing] those advantages unique to the corporate form," to which the law was narrowly tailored. Id. This rationale was rejected outright in Citizens United, 558 U.S. at 351, where it was characterized as an interest in equalizing speech among different groups, something that had already been rejected in Buckley, 424 U.S. at 48 (no compelling interest in "equalizing the relative ability of individuals and groups to influence the outcome of elections").

Austin, 494 U.S. at 665-666, also articulated a government interest in protecting dissenting corporate shareholders from financially supporting the corporation's political activities. Unlike a corporate shareholder, a union member who disagrees with the union's political activities may remain in the organization without being forced to contribute to such activities. Id. Thus, according to the Supreme Court in Austin, 494 U.S. at 666, "funds available for a union's political activities more accurately reflects members' support for the organization's political views than does a corporation's

general treasury."  The Supreme Court in Citizens United, 558 U.S. at 361-362, rejected this rationale as well, holding that "procedures of corporate democracy" (citation omitted) were the appropriate avenue for relief for dissenting shareholders, and that such a rationale would "allow the Government to ban the political speech even of media corporations," id. at 361. Further, the Supreme Court determined that the appropriate remedy for any such interest would be to "consider and explore other regulatory mechanisms," not to restrict corporate speech. Id. at 362.  Perhaps most importantly, the Supreme Court has also expressly stated that "[n]o matter how desirable it may seem, it is not an acceptable governmental objective to 'level the playing field,' or to 'level electoral opportunities,' or to 'equaliz[e] the financial resources of candidates'" (quotations and citation omitted).  McCutcheon, 572 U.S. at 207 (plurality opinion).

Thus, Citizens United overruled the rationales from Austin that would have most obviously supported disparate treatment among business corporations, nonprofits, and unions, at least in the context of independent expenditures.[5]  The question then

---

[5] The Supreme Court has also articulated a permissible government interest in anticircumvention.  The court here relies on examples in the record of corporate campaign finance violations as indicative that § 8 is necessary as an anticircumvention measure.  See ante at    .  The court's

remains whether the Supreme Court would extrapolate this reasoning into the area of political contributions, where quid pro quo corruption and the appearance of such corruption are directly implicated and remain important concerns. See Buckley, 424 U.S. at 26-27. In determining whether such extrapolation will occur, we must also consider another set of Supreme Court cases. Although these cases involved challenges to a Federal statute that banned contributions from for-profit corporations, nonprofit corporations, and unions in a similar manner, the Supreme Court did include language focused on the specific concerns raised by corporations, including some of the same type of reasoning from Austin that was disavowed in Citizens United, at least in the context of independent expenditures.

In Beaumont, for example, a nonprofit corporation, North Carolina Right to Life, Inc., challenged the constitutionality of the Federal ban on direct contributions. In upholding the

---

reliance on anticircumvention is also questionable for two reasons. First, the continued validity of the anticircumvention rationale as a separate compelling government interest remains unclear after McCutcheon. See McCutcheon 572 U.S. at 211 (plurality opinion) (stating that prevention of corruption and appearance of corruption is "only" legitimate government interest for restricting campaign finances, while skeptically referring to "Buckley's circumvention theory"). Second, to the extent it still is a valid interest, the court fails to indicate why individuals are more likely to attempt to circumvent individual contribution limits through a corporation than through a nonprofit or a union, and I discern nothing in the case law to suggest this.

law, the Supreme Court emphasized "the 'special characteristics of the corporate structure' that threaten the integrity of the political process," Beaumont, 539 U.S. at 153, quoting NRWC, 459 U.S. at 209, and "the public interest in 'restrict[ing] the influence of political war chests funneled through the corporate form," Beaumont, supra at 154, quoting Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 500-501 (1985) (NCPAC).  In so doing, the Supreme Court connected these war chests to the objective of preventing corruption or the appearance of corruption.  Beaumont was not discussed in Citizens United, thereby raising the question whether the rationales rejected in the context of independent expenditures may still be viable in the context of direct contributions when connected to concerns about corruption.

Indeed, in NRWC, another case involving direct contribution restrictions and the uniform Federal ban, the Supreme Court reiterated that "'differing structures and purposes' of different entities 'may require different forms of regulation in order to protect the integrity of the electoral process'" from corruption.  See NRWC, 459 U.S. at 210, quoting California Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182, 201 (1982).  See also Beaumont, 539 U.S. at 154-155 (discussing "war-chest corruption"); Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 257 (1989) (discussing "concern

over the corrosive influence of concentrated corporate wealth");
NCPAC, 470 U.S. at 500-501 ("compelling governmental interest in
preventing corruption supported the restriction of the influence
of political war chests funneled through the corporate form").
The majority in Citizens United distinguished NRWC by stating
that the law at issue in NRWC involved restrictions on direct
contributions, "which, unlike limits on independent
expenditures, have been an accepted means to prevent quid pro
quo corruption."  See Citizens United, 558 U.S. at 358-359.

These cases also exhibit deference to legislative judgments
about how best to target corruption in the arena of direct
contributions, at least when confronting evenhanded bans on
contributions, Buckley, 424 U.S. at 31 ("a court should
generally be hesitant to invalidate legislation which on its
face imposes evenhanded restrictions").  See NRWC, 459 U.S. at
209-210 ("The statute reflects a legislative judgment that the
special characteristics of the corporate structure require
particularly careful regulation" and "we accept Congress's
judgment").  See also Beaumont, 539 U.S. at 155, quoting NRWC,
supra at 209-210 ("our cases on campaign finance regulation
represent respect for the 'legislative judgment that the special
characteristics of the corporate structure require particularly
careful regulation'"); Buckley, 424 U.S. at 28 ("Congress was
surely entitled to conclude that disclosure was only a partial

measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions"). But this statute is at least arguably not "evenhanded" as it treats business corporations differently from nonprofits and unions for the purposes of preventing corruption.

How the Supreme Court will harmonize these cases with Citizens United remains unclear. Considerations about the amassing of wealth and the corporate structure seem to be handled differently depending on the context. It may be that contributions and concerns about quid pro quo corruption, or its appearance, allow in these considerations but independent expenditures, and the speech they entail, do not. This remains to be seen.

The court, here, does not confront the complexities of differential treatment in the case law. Indeed, the court has avoided any discussion of Austin, except in two footnotes. See ante at notes 5 and 8. Upon an examination of the jurisprudence, it is far from clear whether the reasoning of Austin will allow distinctions among business corporations, nonprofits, and unions, and if so, how.

Ultimately, however, we cannot base our decision on speculation over whether the Supreme Court will extend its

reasoning in Citizens United into the contribution case law and hold that singling out business corporations for differential treatment based on reasoning in Austin is impermissible. As the Supreme Court itself has stated:

> "We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [other courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

Agostini v. Felton, 521 U.S. 203, 237 (1997), quoting Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989). Federal courts have continued to apply the existing jurisprudence on direct contribution restrictions, rather than attempting to anticipate possible changes from what the Supreme Court has said in the context of independent expenditures. See, e.g., Iowa Right to Life Comm., Inc. v. Tooker, 717 F.3d 576, 602-603 (8th Cir. 2013), cert. denied, 572 U.S. 1046 (2014) (applying Austin's equal protection clause analysis to uphold law banning corporate contributions but permitting union contributions); Minnesota Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 879 (8th Cir. 2012) (applying Beaumont, as well as Austin insofar as it was not explicitly overruled in Citizens United, to review denial of preliminary injunction sought against statute that bans corporation contributions but

not union contributions); Ognibene v. Parkes, 671 F.3d 174, 184 (2d Cir. 2012) ("Since the Supreme Court preserved the distinction between expenditures and contributions, there is no basis for Appellants' attempt to broaden Citizens United"). Supreme Court "decisions remain binding precedent until [that court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." Bosse v. Oklahoma, 137 S. Ct. 1, 2 (2016), quoting Hohn v. United States, 524 U.S. 236, 252-253 (1998). For this reason, I concur in the judgment, as the Supreme Court has not yet extended its holding in Citizens United to restrictions on direct contributions.